# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>              Respondent,<br><br>    v.<br><br>MOWLID Y MOHAMED,<br><br>              Appellant. | No. 72133-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: September 14, 2015 |

LEACH, J. — Mowlid Y Mohamed appeals his conviction for second degree assault with a deadly weapon. Mohamed challenges the sufficiency of the evidence to prove that he intentionally assaulted another, using his dog as a deadly weapon. Because the record contains sufficient evidence about Mohamed's intent, the ability of the dog to cause death or substantial bodily harm, the degree of force used, and the actual injuries inflicted for a rational fact finder to find Mohamed guilty beyond a reasonable doubt, we affirm.

## Background

On the evening of March 24, 2014, Ali Yusuf Ali came into contact with Mowlid Mohamed outside a coffee shop in the city of SeaTac.

Ali stood with several other individuals when he was approached by Mohamed, who had a dog on a leash, and Tyler Webster. Ali, who is from Somalia, identified Mohamed as also being Somali.

The two men and the dog got to about ten feet away from Ali with the dog still on the leash. Ali observed Mohamed let go of the leash and tell the dog, "[G]et him, get him, get him." The dog attacked Ali, knocking him to the ground. The dog bit Ali's arm, breaking through a jacket and shirt he wore that night. While the dog was biting Ali, Mohamed stood in the general vicinity, said, "[G]et him, get him," and did not try to pull the dog off of Ali. Onlookers pulled the dog off of Ali. Mohamed came over, picked up the leash, and walked away with the dog. Ali's injury required stitches and left scarring. His hand remained swollen at trial, and he testified that the area of the bite still occasionally went numb.

At trial, Mohamed testified differently. He said that he was talking to people at the coffee shop when Ali asked him why he had a dog and advised Mohamed, "[Y]ou know you're not supposed to have no dogs." Mohamed told Ali that it was none of his business. Ali said, "[Y]ou think this dog is not going to kill somebody," and Mohamed replied, "[H]ey, I don't know." Ali then said, "I'm going to break his neck, because you're not supposed to have the dog," and Ali came by and hit the dog. Ali did not comment about the dog hurting someone else but instead asserted that the Muslim religion did not allow individuals to have dogs. Mohamed testified that while Ali was "still talking s***" and Mohamed was talking to other people, the dog got free. Mohamed did not realize what happened until Ali fell to the ground and cried. Mohamed ran to where Ali lay, pulled the dog off, and left.

Ali called 911. Deputy Bartolo arrived at the scene and contacted Ali, who was holding his left arm, which was bleeding and had some type of puncture wound. Deputy Bartolo again contacted Ali at Highline Hospital in Burien, where he was taken for treatment of his injuries. Deputy Bartolo noted that Ali had six puncture wounds on his arm with flesh visible through the wounds. Deputy Bartolo photographed Ali's injuries, and the photographs were admitted at trial.

King County Sheriff's Deputy Mark Lohse-Miranda was also dispatched on the 911 call and located Mohamed, Webster, and the dog approximately one block south of where the incident took place. Mohamed initially denied anything transpired but then told Deputy Lohse-Miranda, "[W]ell, that guy was talking s***." After King County Sheriff's Deputy Michael Yamamoto transported Mohamed to jail, the dog was put into the back of Deputy Lohse-Miranda's patrol car. Deputy Lohse-Miranda remained at the scene with the dog waiting for animal control for more than half an hour and, during the entire contact, observed no aggression and no resistance from the dog.

King County Animal Control Officer Thomas Harris responded to a dispatch request that evening to impound the dog. Officer Harris described the dog as "very affable" and stated that from his observations, the dog seemed to be "well socialized and well trained." Officer Harris took custody of and led the dog from the patrol car using a soft leash, as he had no fear that the dog would be aggressive or try to bolt and escape.

Officer Harris took the dog to the central animal control shelter in the city of Kent. Officer Harris identified the dog as a generic pit bull and made a number of observations, noting, "The musculature was very, very well musculatured, fine definition, a healthy animal here. . . . And with this dog, I was struck by how—how healthy and large for his breed. It was on the upper end of the sizes." Officer Harris testified that a pit bull has among dogs the third most powerful jaw and bite strength. Officer Harris described the bite style of a pit bull, saying, "[T]his type of dog bites and holds on and won't— . . . . They're trying to . . . get the prey or the other animal down."

Officer Harris testified that from what he observed of the dog, the dog could act aggressively if it had a perception that its handler was being threatened, but the dog was very appropriate temperament-wise and showed no sign of aggression. Officer Harris also testified that if a dog recognizes someone as his master, that dog will lock in and follow commands that he gets from that person.

The State charged Mohamed with one count of assault in the second degree with a deadly weapon. A jury found Mohamed guilty. He appeals.

Analysis

Mohamed contends that the State presented insufficient evidence to prove that he intentionally assaulted Ali with a deadly weapon.

In reviewing a challenge to the sufficiency of the evidence, we view all facts and reasonable inferences in the light most favorable to the State to

-4-

determine whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt.[1] A crime's elements may be established by either direct or circumstantial evidence, one being no more or less valuable than the other.[2] A challenge to the sufficiency of the evidence admits the truth of the State's evidence.[3] Using this deferential standard, we leave questions of credibility, persuasiveness, and conflicting testimony to the jury.[4]

Here, the State was required to prove that Mohamed intentionally assaulted Ali with a deadly weapon.[5] RCW 9A.04.110(6) defines two categories of deadly weapons: (i) deadly weapons per se, namely, "'any explosive or loaded or unloaded firearm'" and (ii) deadly weapons in fact, namely, "'any other weapon, device, instrument, article, or substance . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.'"[6]

Under the plain meaning of this statute, mere possession does not make "deadly" a dangerous weapon other than a firearm or explosive.[7] Unless a dangerous weapon falls within the narrow category for deadly weapons per se, its status depends on how it is used, attempted to be used, or threatened to be

---

[1] State v. Lord, 117 Wn.2d 829, 881, 822 P.2d 177 (1991).
[2] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).
[3] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).
[4] In re Pers. Restraint of Martinez, 171 Wn.2d 354, 364, 256 P.3d 277 (2011) (citing State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992)).
[5] RCW 9A.36.021(1)(c); RCW 9A.04.110(6).
[6] Martinez, 171 Wn.2d at 364-65 (alteration in original) (citing State v. Taylor, 97 Wn. App. 123, 126, 982 P.2d 687 (1999)).
[7] Martinez, 171 Wn.2d at 366.

used.[8]  To prove Mohamed's dog a deadly weapon for purposes of assault in the second degree, the State must show it is a deadly weapon in fact.

To determine if the object is a deadly weapon in fact, we look to the circumstances of its use.[9]  More specifically, we consider if the defendant used it in a manner "capable of causing . . . substantial bodily harm."[10]  To do this, "we look at the assailant's intent, his ability to cause substantial injuries, the degree of force, and the potential or actual injuries inflicted."[11]

Mohamed relies on the reasoning and holding in In re Personal Restraint of Martinez[12] to support his argument.  We find that case distinguishable from this one.  In Martinez, the Supreme Court found the evidence insufficient to prove a knife was a "deadly weapon in fact."[13]  In that case, police officers chased Martinez out of a building while investigating a possible burglary, caught up to him, and found an empty knife sheath on his belt.  They also found a knife in the mud approximately 15 feet from where they caught up to him.[14]  However, no one testified to seeing Martinez use, reach for, or manifest any intent to use the knife.[15]  The State relied exclusively on the unfastened sheath on his belt to

---

[8] Martinez, 171 Wn.2d at 366; RCW 9A.04.110(6).

[9] State v. Barragan, 102 Wn. App. 754, 761, 9 P.3d 942 (2000) (citing State v. Shilling, 77 Wn. App. 166, 171, 889 P.2d 948 (1995)).

[10] State v. Hoeldt, 139 Wn. App. 225, 230, 160 P.3d 55 (2007) (alteration in original) (quoting Shilling, 77 Wn. App. at 171).

[11] Hoeldt, 139 Wn. App. at 230 (citing Barragan, 102 Wn. App. at 761).

[12] 171 Wn.2d 354, 256 P.3d 277 (2011).

[13] Martinez, 171 Wn.2d at 368-69.

[14] Martinez, 171 Wn.2d at 357-58.

[15] Martinez, 171 Wn.2d at 368.

prove that he attempted to use the knife.[16] The court held this evidence insufficient for a rational fact finder to find intent to use the weapon beyond a reasonable doubt.[17]

Unlike Martinez, where the Supreme Court emphasized that no one observed Martinez with the knife,[18] here the State presented evidence that Mohamed possessed a large pit bull, intended to use the dog, and did use the dog to attack Ali, causing him substantial bodily harm.

Ali testified that he observed Mohamed handling the dog on a leash, dropping the leash, and saying, "[G]et him, get him, get him," before the dog charged and attacked Ali. Deputy Yamamoto testified that Mohamed told Deputy Yamamoto that he owned the dog. The State presented evidence that Ali sustained substantial bodily harm, including stitches, swelling, scarring, and numbness as a result of the attack. The State also presented evidence showing Mohamed's intent: Mohamed's demeanor after the incident, picking up the dog's leash and walking away, failing to help Ali, and then denying that anything had happened when asked by police before indicating that Ali had been talking in an insulting way to him. Additionally, Officer Harris testified about the dog's ability to cause substantial bodily harm. He testified that the dog was very large and well-muscled, on the large end of size for the breed recognized as a pit bull, and pit bulls are in the top three ranking for bite and jaw strength of recognized breeds.

---

[16] Martinez, 171 Wn.2d at 369.
[17] Martinez, 171 Wn.2d at 369.
[18] Martinez, 171 Wn.2d at 369.

In State v. Hoeldt,[19] the court held that a dog, as used in that case, fit the statutory definition of a deadly weapon. Officers went to Hoeldt's home to serve an arrest warrant, pushed open a partially opened door, and knocked.[20] According to Detective Bryan Acee, the house was dark, but, with his flashlight, he could see Hoeldt standing about 25 feet away, holding what looked like a large pit bull by either the collar or neck.[21] The dog started barking and growling at Detective Acee.[22] Hoeldt motioned with his arm, and the dog charged toward Detective Acee, lunging at his throat and chest.[23]

Similar to the facts in Hoeldt, here Ali observed Mohamed controlling a large pit bull on a leash, a breed of dog with an extremely powerful bite.[24] In Hoeldt, the defendant commanded the dog with an arm motion to attack Detective Acee before it charged the detective.[25] Here, Ali testified that Mohamed dropped the leash and instructed the dog, "[G]et him, get him, get him," before it attacked Ali. Thus, sufficient evidence supports a finding that Mohamed used his dog as a deadly weapon in fact because he used the dog in a manner capable of causing substantial bodily harm.[26]

---

[19] 139 Wn. App. 225, 230, 160 P.3d 55 (2007).
[20] Hoeldt, 139 Wn. App. at 227.
[21] Hoeldt, 139 Wn. App. at 227.
[22] Hoeldt, 139 Wn. App. at 227.
[23] Hoeldt, 139 Wn. App. at 227.
[24] Hoeldt, 139 Wn. App. at 227.
[25] Hoeldt, 139 Wn. App. at 227.
[26] Hoeldt, 139 Wn. App. at 230.

## Conclusion

When viewed in the light most favorable to the State, the record contains sufficient evidence about (i) Mohamed's intent, (ii) the ability of his dog to cause substantial injuries, (iii) the degree of force used, and (iv) the actual injuries for a rational fact finder to find that the State proved Mohamed guilty of second degree assault with a deadly weapon. We affirm.

*Leach, J.*

WE CONCUR: